Filed 2/13/15  P. v. Phillips CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B251531 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA308582) |
| v. | |
| ROBERT LEE PHILLIPS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Modified, and, as so modified, affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Robert Lee Phillips appeals his convictions for first degree murder, second degree murder, and attempted murder. He contends the trial court erred by excluding evidence; the prosecutor committed misconduct during argument, and defense counsel was ineffective for failing to object; the evidence is insufficient to support his convictions; and he is entitled to two additional days of custody credit. The People contend that the minute order must be corrected to accurately reflect various fines and fees imposed. We agree that Phillips's custody credits and the amounts of the fines and fees must be corrected. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

Viewing the evidence in the light most favorable to the verdict (*People v. Najera* (2006) 138 Cal.App.4th 212, 215), the evidence relevant to the issues presented on appeal was as follows.

a. *People's evidence*

(i) *The shooting*

Paulette Phillips and appellant were married in 1995. Paulette had three daughters, victims Toni Bembo Raven, Sabrina Taylor, and Charlotte Johnson, all of whom were adults at the time of the offenses and were not biologically related to Phillips.[1] Phillips, a blues musician, was 59 years old at the time of the murders.

Taylor celebrated her 30th birthday on September 2, 2006, with a party attended by family and friends. Johnson travelled to Los Angeles from Kentucky for the fete. The festivities began in the afternoon in Griffith Park. After a park ranger informed the group that their music was too loud and their decorations were against park regulations, the party was moved to the Phillips residence, with Paulette's and Phillips's agreement. Among the attendees were Paulette; Phillips; Raven; Raven's young son, David; Johnson; Paulette's sister and brother, twins Larry Nelson and Larryette Nelson; Larryette's daughter, Deirdre Green, and son, Shawn Osborne; Paulette's nieces, Charquinta Davis

_____

[1] For ease of reference, we sometimes hereinafter use first names when more than one individual shares the same last name.

and Sophia Forrest; Sophia's son James; Davis's husband, Tommy McCoy; and their children, Vanaria Brady, Shaila Smith, and Tykeese.

Once at the house, the group continued the festivities in the garage. As the afternoon turned to evening, more attendees arrived, including many of Taylor's, Johnson's, and Sophia's friends. People came and went, and as many as 40 to 60 people were at times in attendance. During the party, Phillips socialized with a friend in an outside bar area, drinking. He was pacing and appeared to be angry and "distant." As guests whom Phillips did not know arrived, he became angry and upset. He said, "Who are these people? I don't know these people" and "[w]ho the hell is all these motherfuckers at my house?" He opined that they looked "like gang bangers." McCoy and Darren Parker, whom Taylor had hired as a disc jockey (DJ) for the event, also thought some of the new arrivals looked like gang members. Other partygoers, including Paulette, Brady, Sophia, James, Osborne, and Davis, testified that there were no gang members at the party, or that they were unaware of gang members' presence. Police officers believed that as of 2007, Osborne was a member of the Rolling Thirties gang with the moniker "Little Rich," and party guest George Wilkerson was an Eight Trey Crip who used the moniker "G-Smooth."

Parker initially played "mellow music," such as rhythm and blues (R & B). A couple hours into the party, Taylor asked him to play hip-hop and rap, including a song entitled "Gangster Party" by Tupac Shakur. Phillips approached Parker and expressed concern about profanity in the music given the presence of elderly people and children, and requested that Parker resume playing R & B. Parker agreed. However, sometime later Taylor requested "Gangster Party" again. After Parker played the song, Phillips said, "I thought you said that you [weren't] going to play the cussing music." Parker told Phillips Taylor had requested the song, and he felt obliged to play it since she had hired him. When Phillips walked away, Taylor asked Parker what Phillips had said. When Parker told her, Taylor replied, "Don't worry about him. This is my mother's house."

Taylor then did a "birthday dance" in the driveway while party guests threw money at her and pinned money on her, a family tradition. She danced to one of her

favorite songs, "Get Low" by Lil Jon and the East Side Boyz, which she requested that Parker play. Phillips watched from the bar with an angry look on his face.

When Paulette and her daughters were unpinning the money from Taylor, Phillips "hollered" at Paulette, loudly stating he did not want any more "cussing music" played. Paulette said she would talk to the DJ. Johnson told Phillips not to yell at her mother. Phillips said something in return, and Johnson replied, "Is nobody scared of you, Bobby." Phillips "balled up" his fists as if to hit her. Taylor, Johnson, and Paulette all began arguing with Phillips, yelling at him and telling him to leave. Paulette said, " 'Just get him out of here.' " According to at least two witnesses, Phillips said he was going to get his gun.

It was undisputed that Phillips then left the party, going to the sidewalk near his van through the sliding driveway gate. The witnesses gave contradictory accounts of how he got there, however. Raven and Parker testified that two or three men grabbed Phillips under the arms and pushed, "bounced," or took him outside. Sophia testified that she, her cousin Derange, Osborne, and Wilkerson escorted Phillips out the gate, but only she touched him, pushing him with a hand on his chest. Larry told police, and testified at the preliminary hearing, that he saw Osborne and two men push Phillips out. Larryette, Smith, and Brady testified that Phillips walked through the gate on his own, and no one was with him.

Once Phillips was outside the gate, Sophia and Osborne talked to him to try to calm him down. However, Sophia yelled and cursed at Phillips. Phillips said, "Sophia, you don't understand these bitches. They do this all the time. You just don't understand. They are bitches. They are whores. . . . They do this shit all the time. Just like [their] mom." Sophia responded that it was not the right time to discuss these concerns. Phillips responded, "You just don't understand because you don't be around a lot. You just come to the gatherings," "but these bitches is like—they do it all the time." Sophia and Phillips talked for approximately five minutes.

Meanwhile, Taylor took the microphone from Parker, who cut the music. The witnesses variously testified that Taylor, using the microphone, said " 'Get this mother-

4

fucker out of here' ''; "[m]y stepfather is tripping. This is my party, and . . . I might have to cancel the party"; and "[p]ut him out the yard and close the gate and don't let him back in, because I am fixing to call the police because he got a lot of guns in the house."

Apparently in response to Taylor's comments, Phillips pulled a gun from his waistband. When Osborne asked why he did so, Phillips did not respond. Phillips cocked the gun, took a deep breath, and fired it at the ground once or twice. Everyone in the yard froze. Phillips said, "Oh, well, ain't nobody leaving?" or "you motherfuckers not leaving?" Phillips put his arm over the yard wall and waved the gun around.

Pandemonium ensued. The partygoers scattered, with some running towards the street and others seeking shelter in the house. Phillips walked past Larry and aimed at and shot Johnson in the head as she attempted to run away from him into the house. She fell to the ground.

Phillips then walked into the house. Green hid behind a couch in the garage. Davis and her children ran and hid in a bedroom inside the house. Larry, who could hear additional shots being fired in the house, walked down the street and called 911. Paulette had begun a 911 call after she saw Phillips at his van, because she believed he was retrieving a gun. She dropped the phone mid-call and fled to a neighbor's home through the laundry room. Phillips appeared at the laundry room door moments later. Larryette picked up the phone Paulette had dropped and continued the 911 call. She then attempted to leave the house, but encountered Phillips in the hallway. Phillips shot at her but missed. He tried to shoot again but the gun did not fire. Larryette joined the group hiding in the bedroom.

Raven and Taylor, concerned that Phillips was coming after them, left Raven's young son David with the group inside the bedroom and went to lock the family room door. Phillips was entering the family room as they neared the door. He fired a shot, and the women switched course and ran away from him, towards the living room. As Raven reached the living room she turned to see Taylor behind her, lying in a fetal position on the office floor, with Phillips standing over her. Phillips pointed the gun at Raven and fired. Raven ducked and felt the bullet pass by her ear. Unable to exit through the locked

5

front door, she hid under the dining room table. While hiding there, she saw a male party guest near the front door. Upon seeing Phillips, the guest held up his hands and said, "I don't want any problems." In response Phillips gestured with his gun, indicating the guest could leave.

Phillips then walked down the hall. He opened the door to the bedroom where Davis's group was hiding, pointed the gun, and said, "All you motherfuckers get out here, out of my house." It appeared to Brady that he was searching for someone. Brady said, "Bobby, no." Phillips turned and left. The group in the bedroom retreated to a nearby closet, where they hid.

Both Raven, hiding under the table, and Davis, hiding in the closet, could hear Taylor calling for help. Raven and Larryette heard two more gunshots in the office. Taylor was then silent.

Emerging from under the dining room table after Phillips had gone to another room, Raven saw Taylor lying on the office floor, bleeding. Raven could still hear gunshots outside. Brady opened the closet door and pulled Raven inside the closet.

Green, meanwhile, had come out from behind the garage couch, and observed Johnson's and Taylor's bodies. She unsuccessfully attempted to revive them. She called 911. She saw Phillips at the gate. He yelled, " 'Who the fuck is that in my house?' " The 911 operator told Green to move to safety, and she hid until police arrived.

When Phillips began shooting, James had attempted to climb the front yard wall but became stuck. He saw between five and seven muzzle flashes inside the house. He heard someone exit the house and heard Phillips threaten, " 'By the time I get to my car, if you are not off the property then you are going to get it too.' " Phillips returned to his van.

Sophia, who had seen Phillips exit the yard and return to his van, prevailed upon a party guest named Poppy, who was armed with his own gun, to shoot Phillips.[2] Poppy shot at Phillips multiple times, but the shots only grazed Phillips.

Osborne, Larry, and James did not see Poppy shoot at Phillips. However, when they headed towards the house to check on the other partygoers, they found Phillips by a tree outside the yard, near his van, fidgeting with something in his hands, apparently reloading his gun. Phillips popped his head up said, "Oh, you guys are still here?" He chased Larry, Osborne, James, and Sophia down the street, shooting at them as they ran.

(ii) *The investigation*

Police arrived on the scene. They found Johnson's body lying three feet from the back door. She had a gunshot wound to the head and was unresponsive. Taylor's body was found in the office; she had suffered a gunshot wound to her torso and was unresponsive. They found Phillips lying face down on the garage floor. It appeared that he had been shot in the buttocks.

A .9-millimeter semiautomatic Makarov model handgun was on a shelf approximately three feet away from where he was lying. It was loaded with three rounds in its magazine, plus a live round in the firing chamber. In Phillips's pocket, police found an empty six-round magazine for the Makarov. In Phillips's van, a detective found a gun case and two hollow-point bullets, one that fit the Makarov. A cloth gun holster was on the grass next to the van.

Johnson suffered a single, fatal gunshot wound to the head. Forensic analysis showed that the bullet that killed her was a hollow-point bullet, fired from Phillips's Makarov.

Taylor suffered three gunshot wounds: a fatal wound that perforated her heart; a life-threatening wound that passed through her thigh, hitting the femoral artery; and a through-and-through wound to her thigh. The fatal wound to her heart was made by a hollow-point bullet. Forensic analysis showed it was likely the bullet was fired from

---

[2] Sophia did not tell police that Poppy was responsible for shooting Phillips until over six years after the incident, in January 2012.

Phillips's Makarov; however, test results were not conclusive because of the poor quality of the bullet sample.

Phillips was treated at a hospital immediately after being found by police. He had two gunshot "graze" wounds on his thighs. The wounds would have bled, but were not serious and would not have prevented him from walking. Phillips's blood alcohol level was .145.

Police found a small pool of Phillips's blood next to the van; a trail of his blood going north on Cimarron, east on 84th Place, and back again; and a trail of his blood leading from the sidewalk into the garage. Phillips's blood was not found in the house.

Police personnel found five spent .9-millimeter Makarov casings which forensic testing revealed to have been fired from Phillips's Makarov: one in the driveway, one in the front yard, one on the grass near Johnson's body, one on the sidewalk, and one in a bathroom inside the house near where Taylor's body was found. An expended bullet on the living room floor was also fired by Phillips's Makarov. A fragment of a bullet jacket found in the office near Taylor's body was determined to have been part of the bullet recovered from her body. A bullet fired from the Makarov was also found in a neighbor's truck on 84th Place. Given the number of casings found at the scene and the number of bullets remaining in the Makarov, Phillips must have reloaded during the shooting spree.

Police personnel found additional .9-millimeter casings, fired from a gun other than the Makarov, on the sidewalk in front of the house. Bullets and bullet fragments fired from a gun other than the Makarov were also found in or near the van.

Police found numerous firearms and ammunition, including hollow-point bullets, in the garage and house. The firearms, including the Makarov, were legally registered to Phillips. There was no indication Phillips used a gun other than the Makarov during the incident.

b. *Defense evidence*

A forensic toxicologist testified that Phillips was a light drinker with a low tolerance for alcohol. Such a person can be "strongly affected" by alcohol, may have "a huge loss of inhibitions," and "can't react to what's happening in a rational, calm way."

Leroy Wilson, a friend of Phillips's, attended the party at Phillips's invitation. As the party progressed and more people arrived, some of the attendees appeared to be "gang material." Wilson said to Phillips, "It is a bunch . . . of gang members." However, he did not see anyone throw gang signs or call out gang names. He left when he heard a commotion and saw people running.

Robert Freeman testified for the defense as a gang expert. The Phillips residence was located in an area controlled by the Eight Trey Crips criminal street gang. In 2006, Eight Trey Crips gang activity was ongoing in the area. The gang was "at war" with the Rolling Sixties gang. Gang members had committed shootings, robberies, murders, and attempted murders. The Rolling Thirties gang was also a rival of the Eight Trey Crips. The Eight Trey Crips gang was founded in the late 1970's by Tookie Williams, a well-known gang member. In gang culture, respect is of paramount importance. If one "disrespect[s]" a gang member or his or her family, there may be consequences. If a gang member is at a party and someone yells, " 'He is going to get a gun,' " a typical gang member will react by trying to pull out his own weapon. When gang members attend parties, shootings sometimes occur. Gang members who go into rival gang neighborhoods tend to travel in groups of five or six persons in case a fight breaks out.

2. *Procedure*

Phillips was charged with the first degree murders of Johnson and Taylor (counts 1 and 2), and the attempted murders of Raven, Sophia, Larry, and Osborne (counts 3 through 6). He was tried three times.

In the first trial, the jury found Phillips guilty of the attempted voluntary manslaughters of Larry and Osborne, lesser included offenses of murder. (Pen. Code,

9

§§ 664, 192, subd. (a).)[3] It also found true the allegation that Phillips personally used a firearm during commission of the crimes. (§ 12022.5, subd. (a).) It acquitted Phillips of the first degree murder of Johnson, and deadlocked on all remaining charges. The trial court declared a mistrial on counts 1, 2, 3, and 4.

At the second trial, the jury deadlocked on all charges and the trial court declared a mistrial.

At the third trial, from which the instant appeal is taken, the jury found Phillips guilty of the second degree murder of Johnson and the first degree murder of Taylor (§ 187, subd. (a)), and the willful, deliberate, and premeditated attempted murders of Raven and Sophia. It also found Phillips personally and intentionally used and discharged a firearm in commission of the crimes, causing Johnson's and Taylor's deaths (§ 12022.53, subds. (b), (c) & (d)), and found true the special circumstance allegation that Phillips committed multiple murders (§ 190.2, subd. (a)(3)).

The trial court sentenced Phillips to life in prison without the possibility of parole, plus two terms of life in prison with the possibility of parole, plus 65 years to life, plus a determinate term of 49 years 4 months. It ordered Phillips to pay victim restitution, and imposed a restitution fine, a court security fee, and a criminal conviction assessment.

Phillips appeals the judgment entered at the third trial, that is, his convictions for first degree, second degree, and attempted murder.

DISCUSSION

1. *The trial court did not abuse its discretion or infringe Phillips's constitutional rights by excluding evidence.*

Prior to trial the prosecutor moved to exclude the following items of evidence or lines of inquiry as irrelevant and lacking in probative value under Evidence Code section 352: (1) Larry's nephew had been killed in a drive-by shooting; (2) James's uncle was murdered in Eight Trey Crip territory; (3) Raven had been in a relationship with a gang member who "beat her"; (4) Taylor had hosted a party at a different

---

[3] All further undesignated statutory references are to the Penal Code.

residence in the neighborhood, and gang members who were excluded "came back shooting"; and (5) Taylor associated with Eight Trey Crip gang members. The trial court also sustained a relevance objection to the defense gang expert's testimony that one of the men who attacked truck driver Reginald Denny during the 1992 Los Angeles riots was an Eight Trey Crip gang member, and sustained a foundational objection to a question whether gang members who attend parties arrive armed with guns. Phillips contends the trial court abused its discretion by excluding the proffered evidence, thereby violating his rights to due process and to present a defense. We disagree.

    a. *Applicable legal principles*

    Only relevant evidence is admissible. (Evid. Code, § 350.) "Relevant evidence" means evidence, including evidence relevant to witness credibility, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (Evid. Code, § 210; *People v. Mills* (2010) 48 Cal.4th 158, 193; *People v. Lee* (2011) 51 Cal.4th 620, 642.) Relevant evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *Lee*, at p. 643; *People v. Waidla* (2000) 22 Cal.4th 690, 724.)

    A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission. (*People v. Mills, supra,* 48 Cal.4th at p. 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.) We apply the abuse of discretion standard to a trial court's rulings on the admissibility of evidence, including those turning on the relevance or probative value of the evidence in question. (*People v. Lee, supra,* 51 Cal.4th at p. 643; *People v. Hamilton* (2009) 45 Cal.4th 863, 930.)

    The United States Constitution guarantees criminal defendants a meaningful opportunity to present a defense. (*People v. Cash* (2002) 28 Cal.4th 703, 727; *Crane v. Kentucky* (1986) 476 U.S. 683, 690.) "A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code

11

section 352—generally does not infringe upon this right [citations].” (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Thornton* (2007) 41 Cal.4th 391, 443; cf. *People v. Harris* (2008) 43 Cal.4th 1269, 1291-1292.)  Although the complete exclusion of an accused’s defense may constitute federal constitutional error, “ ‘ “excluding defense evidence on a minor or subsidiary point does not impair an accused’s due process right to present a defense.” ’ [Citation.]” (*Thornton*, at p. 443; *People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)

Phillips urges that the excluded evidence was relevant to his theory that he acted in the heat of passion upon sufficient provocation, and was therefore guilty of voluntary manslaughter, not murder.  Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser offense of murder.  (§ 192, subd. (a); *People v. Moye* (2009) 47 Cal.4th 537, 549; *People v. Benavides* (2005) 35 Cal.4th 69, 102; *People v. Lee* (1999) 20 Cal.4th 47, 59.)  A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation.  (*People v. Beltran* (2013) 56 Cal.4th 935, 942, 951; *People v. Manriquez* (2005) 37 Cal.4th 547, 583.)  “Heat of passion arises when ‘at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.’ [Citations.]” (*People v. Barton* (1995) 12 Cal.4th 186, 201; *People v. Beltran, supra,* 56 Cal.4th at p. 942; *People v. Enraca* (2012) 53 Cal.4th 735, 759.)

A heat-of-passion theory of manslaughter thus has both an objective and a subjective component.  (*People v. Moye, supra,* 47 Cal.4th at p. 549; *People v. Manriquez, supra,* 37 Cal.4th at p. 584.)  “The provocation which incites the defendant to homicidal conduct . . . must be caused by the victim . . . or be conduct reasonably believed by the defendant to have been engaged in by the victim.” (*People v. Lee*, *supra,* 20 Cal.4th at p. 59; *Manriquez*, at p. 583.)  The victim’s conduct may have been physical or verbal, but it must have been sufficiently provocative to cause an ordinary person of

average disposition to act rashly or without due deliberation and reflection. (*People v. Beltran, supra,* 56 Cal.4th at p. 939; *People v. Enraca, supra,* 53 Cal.4th at p. 759; *Lee*, at p. 59.) To satisfy the subjective component, the defendant must have killed "while under 'the actual influence of a strong passion' induced by [adequate] provocation." (*Moye*, at p. 550.) " ' "[N]o specific type of provocation [is] required," ' " and "the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] other than revenge [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 163; *Beltran*, at p. 950; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.)

  b. *The trial court did not abuse its discretion by excluding evidence.*

  Phillips argues the excluded evidence was relevant to establish his theory that he acted in the heat of passion, namely that his "stepdaughters . . . provoked him to act rashly and without deliberation by having their gang friends expel [him] from his own home on the night of the party because he objected to gangs and gang culture on the premises." He avers that evidence of his personal experiences with gangs would have established his subjective beliefs that gang members are violent individuals, and that his neighborhood was being "taken over" by gangs; established and justified his unusually deep antipathy for gangs and gang culture; shown that his stepdaughters knew he did not approve of the gang lifestyle and "flaunt[ed]" it in front of him; and helped explain "why he reacted so strongly" when his stepdaughters invited gang member guests and played "gang music" at the party.

  We address each item of excluded evidence seriatim.

  (i) *Evidence regarding Larry's nephew and James's uncle*

  The trial court concluded evidence that Larry's nephew was killed in a drive-by shooting was irrelevant. As the court explained: "We are going to try this case, we are not going to try any gang incident that ever occurred in the history of the world." In regard to evidence that James's uncle had been murdered, defense counsel's offer of proof was that the murder occurred "in the same neighborhood. They are all one family, and these are things the defendant hears and it contributes to his fear of gangs and in the

13

heat of passion defense."

The trial court properly excluded evidence of these crimes as irrelevant. Neither incident was related in any way to the birthday party shootings. There was no suggestion that persons at the birthday party were responsible for the crimes against Larry's nephew and James's uncle. Based on the offers of proof, the contention that the other crimes were even gang-related was speculative. Moreover, evidence Phillips believed gang members were violent and dangerous was of limited value to his heat-of-passion theory. Phillips did not shoot at gang members; he shot at his stepdaughters and other relatives. He did not claim he shot because he believed dangerous gang members were attacking him or were armed and dangerous. As the People point out, evidence Phillips was especially afraid of gang members would have undercut his heat-of-passion argument, as such a fear would logically have made him afraid to launch an attack on party guests. This irrelevant evidence had the potential to confuse the issues and consume an undue amount of time, and was properly excluded. A court lacks discretion to admit irrelevant evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 482.)

(ii) *Evidence Raven was the victim of domestic violence*

Defense counsel sought to question Raven or other witnesses regarding her "being in a relationship with a gang member that beat her." Counsel's offer of proof was that Raven's former boyfriend came to the house looking for her, and Phillips "held him for police." After observing that the evidence had been excluded at the prior trial and preliminary hearing, the trial court opined that it might be admissible if Phillips testified, but was otherwise inadmissible. This was not an abuse of discretion. The proffered evidence was irrelevant. Its only possible probative value was to show that Phillips believed the boyfriend was violent. But there was no logical connection between the fact the boyfriend was a gang member, and the fact he inflicted domestic violence on Raven; it is an unfortunate fact that many persons who lack gang connections are domestic abusers. As we have discussed, Phillips's view that gang members are violent and dangerous was not particularly probative to establish a heat-of-passion theory in any event. This evidence had little or no tendency to establish material facts, but had the

14

potential to distract and confuse the jury. It was properly excluded. (See *People v. Cowan, supra,* 50 Cal.4th at p. 482.)

(iii) *Taylor's previous party*

Defense counsel sought to introduce evidence that Taylor had a party when either she or the family lived at a different address, and "gang members [who] were not let in . . . came back shooting." After establishing that Phillips was not present at the party and the date of the party was unknown, the trial court excluded the evidence. This was not an abuse of discretion. Evidence of gang violence at an unspecified time, involving unspecified gang members, at a venue where Phillips was not present, had little or no relevance to the issues at trial. Evidence Taylor refused admission to gang members and was attacked in response was inconsistent with the defense theory that Taylor was enmeshed in the gang lifestyle and provoked Phillips by associating with gang members at her birthday party. The trial court's ruling was not arbitrary, capricious, or patently absurd. (*People v. Williams, supra,* 43 Cal.4th at pp. 634-635.)

(iv) *Taylor's association with Eight Trey Crips gang members*

Defense counsel also sought admission of evidence that "Sabrina associated with Eight Trey Crips." Counsel averred that this evidence would be relevant to impeach witnesses who testified that no gang members were at the birthday party. The trial court observed that the evidence had been excluded at the prior trial or trials, and excluded it again without further analysis.

The only potential relevance of the proffered evidence was to contradict the testimony of various prosecution witnesses that there were no gang member guests at the birthday party, or they were unaware of the presence of such persons. But general evidence Taylor associated with Eight Trey Crips gang members would have had limited value on this point. That Taylor associated with gang members did not, by itself, show that the prosecution witnesses were untruthful when they stated they did not observe gang members at the birthday party. Thus, evidence of Taylor's association with gang members would not have directly impeached their testimony. In any event, as we discuss *post,* exclusion of the evidence, even if error, was harmless.

15

(v) *Evidence that one of the participants in the Reginald Denny beating was a gang member*

During direct examination, the defense gang expert testified that the Eight Trey Crips were founded in the late 1970's by Tookie Williams. Defense counsel then inquired whether the gang became "somewhat famous because of an event?" The expert replied that during the 1992 riots, one of the persons who attacked truck driver Reginald Denny was an Eight Trey Crips gang member. The trial court sustained the prosecutor's relevance objection and granted her motion to strike the testimony on this point.

Phillips contends the trial court's ruling improperly prohibited the gang expert from testifying to the habits and culture of criminal street gangs. He avers that the "reputation for violence of the gang that controlled [his] neighborhood was important in establishing [his] attitude toward association with gang members and his honest and reasonable fear of them," and would explain why he would not want gang members in his home.

We are not persuaded. Even assuming arguendo that generalized testimony about the habits and culture of criminal street gangs was relevant to Phillips's heat-of-passion theory, the challenged evidence was clearly not. Evidence of an entirely unrelated crime, occurring years before the charged crimes, during an unusual period of civil disturbance in Los Angeles, and committed by persons having no connection to the witnesses or events at issue in the instant matter, was utterly lacking in relevance. As we have explained, Phillips's fear of gang members did not readily support his heat-of-passion theory. The notion that the 1992 attack on Denny showed Phillips bore heightened animosity toward the Eight Trey Crips was fanciful, given the absence of evidence Phillips had any connection to the Denny crime.

(vi) *Questioning regarding whether gang members are typically armed*

During the gang expert's direct examination, defense counsel queried, "Now when gang members attend parties, do they come packed?" The trial court sustained the prosecutor's lack of foundation objection. Defense counsel then asked whether the expert had ever researched homicides where "gang members are involved in parties, and

16

when they are involved in parties sometimes shootings occur?" The witness responded, "Yes."

Phillips argues the trial court improperly sustained the objection because the role that firearms play in gang culture is a proper topic for expert testimony. We do not disagree that, where such testimony is relevant, expert testimony may be allowed on this topic. (See generally *People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) However, the basis for the court's ruling was not that the subject matter was improper, but instead was that there was insufficient foundation that the expert, Freeman, had a basis for his opinion on the issue. Nothing prevented defense counsel from establishing such a foundation and then questioning Freeman further on the issue.

Phillips also contends the court precluded the expert from explaining "the significant role that carrying firearms plays in the 'habits and culture' of street gangs." It did not. The court sustained the prosecutor's foundational objection, but did not thereafter exclude testimony about gang members' habits of carrying firearms. For example, defense counsel subsequently elicited that gang members typically carry concealed revolvers or automatic weapons. Defense counsel did not ask additional questions on the subject. Thus, the trial court did not actually exclude evidence regarding gang members' arming habits on relevance grounds.

(vii) *Even if error, exclusion of the evidence in question was not prejudicial.*

The erroneous exclusion of evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been allowed. (Evid. Code, § 354; *People v. Richardson* (2008) 43 Cal.4th 959, 1001.) No such probability exists here. First, Phillips's contention that the gang evidence supported his heat-of-passion theory is tenuous. Evidence that Phillips was hostile to gang members was of limited value in proving he acted in the heat of passion. The heat-of-passion theory was premised on his stepdaughters' conduct of publicly acting disrespectfully towards him and having him "bounced" out of his own home by party guests whom he did not know. Evidence that these persons were gang members, to whom Phillips was especially hostile, added little to the evidence that he was enraged.

17

Evidence about Phillips's attitudes toward and experiences with gangs might have been relevant if the victims were persons he perceived to be gang members, but they were not; the victims were his stepdaughters and other relatives. To find the gang evidence compelling, the jury would have had to accept that Phillips was especially angry because his stepdaughters invited gang members to the party, played rap music, and had gang member guests escort him from the home, because those same stepdaughters and distant relations had been the victims of gang-related violence; therefore Phillips *shot his stepdaughters*. This theory presented something of a non sequitur. Evidence that his stepdaughters knew "flaunting" the "gang lifestyle" in front of him would provoke him was largely irrelevant; their knowledge or motivations shed no light on Phillips's mental state. Moreover, that Phillips disliked gangs was not a disputed issue and was not likely to be doubted by the jury. It is a matter of common knowledge that gangs engage in violent behavior, and it is unlikely jurors would have given more credence to the theory that Phillips disliked gangs and the gang lifestyle had the evidence in question been admitted.

Moreover, considerable evidence on gangs was presented. The defense expert testified that in 2006 Phillips's neighborhood experienced a significant "gang problem," including shootings, murders, attempted murders, and robberies; that when a gang member hears someone is going for a gun, "he is going to try to pull out" his own weapon; and that he had investigated parties where gang members were involved in shootings. Paulette testified that Phillips had cleaned gang graffiti off their residence twice. There was also evidence that police officers had documented two of the party guests as gang members; McCoy, Parker, and Wilson testified that some of the guests looked like gang members to them; and Parker heard some of the guests state that they were "gang bangers." In short, Phillips was not precluded from presenting his defense. The additional evidence would have added little or nothing to the defense case, and there is no likelihood Phillips would have achieved a more favorable result had it been admitted.

18

2. *Prosecutorial misconduct*

Phillips next argues that the prosecutor committed misconduct by misstating the law on heat-of-passion manslaughter during argument and misstating the evidence, thereby violating his rights to due process and to present a defense. We discern no reversible error.

a. *Applicable legal principles*

The standards governing review of prosecutorial misconduct claims are well settled. A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct that does not render a trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade the trial court or the jury. (*People v. Adams* (2014) 60 Cal.4th 541, 568; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427; *People v. Vines* (2011) 51 Cal.4th 830, 873.) It is misconduct for a prosecutor to misstate the law during argument, misstate or mischaracterize the evidence, or assert facts not in evidence. (*People v. Whalen* (2013) 56 Cal.4th 1, 77; *People v. Davis* (2005) 36 Cal.4th 510, 550; *People v. Boyette, supra,* 29 Cal.4th at p. 435.) When a claim of misconduct is based on the prosecutor's comments before the jury, we consider whether there is a reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*Adams*, at p. 568; *Bryant, Smith and Wheeler*, at p. 427; *People v. Brown* (2003) 31 Cal.4th 518, 553-554.) We consider the challenged statements in context, and view the argument as a whole. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) We do not lightly infer that the jury drew the most, rather than the least, damaging meaning from the prosecutor's statements. (*People v. Shazier* (2014) 60 Cal.4th 109, 144; *People v. Dykes* (2009) 46 Cal.4th 731, 771-772.)

To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. (*People v. Linton* (2013) 56 Cal.4th 1146, 1205; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1358; *People v. Souza* (2012) 54 Cal.4th 90,

19

122.) Here, Phillips never objected at trial to any of the comments he now asserts were improper.  Nothing suggests an objection would have been futile, or an admonition inadequate to cure any harm.  Accordingly, his claims have been forfeited.  (*People v. Adams, supra,* 60 Cal.4th at pp. 568-569; *People v. Tully* (2012) 54 Cal.4th 952, 1011; *People v. Najera, supra,* 138 Cal.App.4th at p. 224.)

Recognizing this, Phillips contends his counsel provided ineffective assistance by failing to object and by failing to correct the prosecutor's misstatements during the defense closing argument.  To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Brown* (2014) 59 Cal.4th 86, 109; *People v. Mai* (2013) 57 Cal.4th 986, 1009.)  We presume counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  (*Mai*, at p. 1009; *People v. Carter* (2003) 30 Cal.4th 1166, 1211.)  If the record sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  (*People v. Gamache* (2010) 48 Cal.4th 347, 391; *Carter*, at p. 1211.)

The legal principles applicable to heat-of-passion voluntary manslaughter have been set forth *ante.*

b.  *The prosecutor's argument*

The prosecutor began by arguing that the evidence showed there had been animosity between Phillips and his stepdaughters prior to the night of the murders; "[h]e had had enough of these bitches doing this to him all these years;" and the "fatal final straw was the disrespect they showed to him in his house."  The prosecutor urged, "He

20

had just had enough.  And he made a decision.  He made a decision to kill . . . them both."  "[T]his was not a sudden provocation.  This . . . . disrespect had been going on."  After detailing the evidence, the prosecutor argued that Phillips was "making decisions, not just reacting wildly.  This is a man making calculated decisions" and "he is not wildly acting here; . . . he is not acting because he was provoked, but . . . this is a man making decisions, calculated decisions."

After further discussing various aspects of the evidence, the prosecutor argued: "Now I want to talk a little bit about why first degree and second degree really need to be your concern in your deliberations and why you should not even consider seriously voluntary manslaughter . . . .  [¶]  Now voluntary manslaughter is jury instruction 570.  And it is, there is a sudden quarrel which causes heat of passion.  [¶]  *Now we know from the facts and from the defendant's demeanor that day that this was not a sudden quarrel.*  He was already in a bad mood almost the entire day.  Reclusive, pacing, and when faced with—when talking to somebody about it, when it got to a high point where he was removed from the yard, *he said to Sophia, 'This has been going on for years.  You don't know what these bitches have been doing to me.'*  [¶]  *This was not a situation where there is some sudden quarrel that causes the heat of passion to arise.  This was a man who was stewing, stewing about what these women have been doing to him all these years.*  [¶]  Now another thing in that instruction that you are to consider in determining if it is voluntary manslaughter or murder is that slight or remote provocation is not sufficient.  So . . . being escorted out of the yard, that provocation is not sufficient.  [¶]  *And it is not enough that he was provoked.  And doesn't that make sense?  I mean, any time somebody uses a handgun and someone is killed, they are pretty much provoked.  [¶] Yes, sometimes you have unprovoked situations such [as] drive-by shootings or whatever.  But generally speaking when someone takes a gun and is angry and shoots at somebody, it is because they are provoked about something.  That's why it is not enough that he was just provoked, or most people would—we wouldn't even have murder charges because there is provocation.*  [¶]  And another thing to keep in mind here is that the standard for provocation is not based upon the defendant's standard.  It is a standard that you have to

21

consider that—whether a person of average disposition in the same situation, and knowing the same facts would have reacted from passion rather than judgment. [¶] So what would anyone in his position—would anyone in his position, not him specifically but a reasonable person under the facts and circumstances, have reacted the same way? So what are the facts and circumstances that a reasonable person in his position would have been confronted with? [¶] Well, that person would have been confronted with some disrespect going on by his stepdaughters, an argument with his wife Paulette earlier that day, and then now being led out in front of a party of approximately 50 people out of a backyard. [¶] *Now would a reasonable person in that position be so provoked to take out a gun and aim and fire at Charlotte's head? The answer is no. That is not reasonable. [¶] Voluntary manslaughter. The classic example would be: You are happily married. You come home unexpectedly during the lunch hour. You go into your bedroom, and there is your wife or husband in the middle of making love to someone else, and you are so enraged, . . . you kill the lover. [¶] That's not what's going on here. This is a man, once again, who was stewing for a very long time about those women doing something to him all these years. And he had had enough, once again. He had had enough.*" (Italics added.)

      c. *Purported misstatement of fact*

Phillips complains that the prosecutor misstated the facts when she stated that there had been animosity between Phillips and his stepdaughters "for 'years.' " He points out that Sophia testified he said his stepdaughters "do this shit all the time," not that they had been engaging in disrespectful conduct for "years." He complains that the prosecutor's comments were a misstatement of the facts because "[s]omething that occurs 'all the time' is not just something that has occurred in the past" but "is happening in the present, too."

To the extent Phillips intends to argue the prosecutor's statements suggested the disrespectful treatment had occurred only in the past, we see no reasonable likelihood that jurors would have interpreted the argument this way. Read in the context of the argument as a whole, the prosecutor's comments cannot be understood to suggest the offensive

22

behavior had ceased.  To the extent Phillips intends to argue that the prosecutor erred by stating the conduct had gone on for years, as opposed to some shorter duration, we see no significant misstatement.  Phillips and Paulette had been married for 11 years, and it was a fair inference from the evidence that the animosity between Phillips and his stepdaughters was of longstanding duration.  A prosecutor has wide latitude during argument, which can include reasonable inferences or deductions to be drawn from the evidence.  (*People v. Thomas* (2012) 53 Cal.4th 771, 822.)  Because the challenged statements were not objectionable, defense counsel did not perform inadequately by failing to object.  Defense counsel is not required to make futile motions or to indulge in idle acts in order to appear competent.  (*People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24.)

      d.  *Statements regarding provocation arising over time*

Phillips contends the prosecutor's argument misled the jury by suggesting that "the provocation that incites heat of passion must arise instantaneously and cannot occur over a period of time," because the prosecutor repeatedly stated "this was not a sudden quarrel" and stressed that the animosity between Phillips and his stepdaughters had existed for years.

Phillips is correct that provocation sufficient to reduce a killing to manslaughter may arise as a result of a series of events over time.  (See *People v. Wharton* (1991) 53 Cal.3d 522, 569; *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245; CALCRIM No. 570.)  However, there is no reasonable likelihood the jury would have interpreted the challenged remarks as Phillips suggests.  Fairly read, the gist of the prosecutor's argument was that Phillips was not acting in the heat of passion, but instead made a calculated, considered decision to put an end to his stepdaughters' perceived abuse by killing them.  This was a fair comment on the evidence.  (See *People v. Shazier, supra,* 60 Cal.4th at pp. 127-128 [prosecutors have wide latitude to discuss and draw inferences from the evidence at trial, and whether the inferences the prosecutor draws are reasonable is for the jury to decide].)  Moreover, the jury was properly instructed with CALCRIM No. 570, which stated:  "Sufficient provocation may occur over a short or long period of

time." The instruction would have dispelled any possibility of confusion.

Moreover, the record suggests counsel had a legitimate tactical reason for failing to object. In rebuttal to the prosecutor's argument, defense counsel urged that the prosecutor's theory—Phillips wanted to kill Taylor and Johnson because he and the women hated each other and the women had acted disrespectfully to him for years—was untenable. Defense counsel urged it was illogical to believe Phillips had a grudge against the victims, or that they had abused him for years, given that the women had never lived with him and Johnson lived in Kentucky. Defense counsel appears to have recognized that evidence of a longstanding, acrimonious relationship between Phillips and the women was, at best, a double-edged sword, in that it could potentially support a finding of premeditation and deliberation. Given that the defense did not argue Phillips acted in a heat of passion that developed over time due to his stepdaughters' prior conduct, counsel could have made a rational tactical choice not to object to the prosecutor's comments. (See *People v. Vines, supra,* 51 Cal.4th at p. 876 [reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel].)

e. *Statements regarding the relationship between provocation and heat of passion*

Next, Phillips avers that the prosecutor erroneously "claimed provocation plays no role in heat-of-passion voluntary manslaughter" when she argued that most shooters are angry and provoked, but this does not establish heat of passion. Viewed in context, the prosecutor's argument was not objectionable. The thrust of the argument was that the mere fact a defendant was angry when he attacked is insufficient to prove he acted in the heat of passion. This was an accurate statement of law. As explained by *Beltran*: "[t]o be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection . . . the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.) "One does not act rashly under [the relevant legal standard] simply by acting imprudently or out of anger. Even imprudent conduct done while angry is ordinarily the product of some judgment and thought, however fleeting. This is not the

24

type of truly reactive conduct contemplated . . . ." "[P]rovocation is sufficient not because it affects the quality of one's thought processes[,] but because it eclipses reflection." (*Id.* at p. 950.) Because the prosecutor's argument was not objectionable, there was no misconduct and defense counsel was not remiss for failing to object.

f. *Statement that the provocation must have been sufficient to cause a reasonable person to kill*

Finally, Phillips argues that the prosecutor mischaracterized the law by stating that in order to show heat of passion, the provocation must be such that an ordinary person would be moved *to kill* in response. We agree that the prosecutor misstated the law, but conclude Phillips has failed to show he would have obtained a more favorable result had counsel objected and the jury been admonished not to consider the argument.

In *People v. Beltran, supra,* 56 Cal.4th 935, our Supreme Court clarified what kind of provocation will suffice to constitute heat of passion. *Beltran* rejected the argument that "the provocation must be of a kind that would cause an ordinary person of average disposition *to kill*." (*Id.* at p. 938.) Instead, the proper standard "focuses upon whether the person of average disposition would be induced to react from passion and not from judgment." (*Id.* at p. 939.)

In *Beltran,* the jury was instructed with a version of CALCRIM No. 570 that stated: " 'In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' " (*People v. Beltran, supra,* 56 Cal.4th at p. 954.) The *Beltran* prosecutor argued that, for example, if one stubs a toe or is cut off in traffic, " '[y]ou don't go out and kill somebody' "; " '[t]hat' s not the standard.' " (*Id.* at p. 943, fn. 5.) Defense counsel countered that the provocation need not have caused a person of average disposition to kill, but must have caused the person to act rashly and impulsively, without thinking. (*Id.* at p. 943, fn. 4.) *Beltran* concluded the instruction was not ambiguous under ordinary circumstances, but that the parties' arguments had "muddied the waters." (*Id.* at p. 954.) The prosecutor's examples suggested that the jury should consider whether an ordinary person would kill in the face of provocation, rather

25

than whether the provocation would have caused an ordinary person to act without due deliberation and from passion rather than judgment. (*Id.* at pp. 954-955.) However, any error was harmless because the jury had sent a note asking for clarification on the point, and the trial court had responded with a correct statement of law. It was therefore not reasonably probable that the jury was misled to defendant's detriment. (*Id.* at pp. 955-956.)

In light of *Beltran,* the prosecutor's statements here, "Now would a reasonable person in that position be so provoked to take out a gun and aim and fire at Charlotte's head? The answer is no. That is not reasonable" were erroneous. (*People v. Beltran, supra,* 56 Cal.4th at pp. 954-955; *People v. Najera, supra,* 138 Cal.App.4th at p. 223 [prosecutor's argument, " '*Would a reasonable person do what the defendant did*? Would a reasonable person be so aroused as to kill somebody? That's the standard' " was an incorrect statement of law].)

However, assuming arguendo that defense counsel was remiss for failing to object, Phillips has not shown prejudice. Phillips's jury was instructed with a revised version of CALCRIM No. 570. Unlike the instruction in *People v. Beltran, supra,* 56 Cal.4th at page 954—which told jurors to consider how an average person " '*would react* in the same situation knowing the same facts' "—the version of CALCRIM No. 570 given here instructed jurors to consider "whether a person of average disposition, in the same situation and knowing the same facts, *would have reacted from passion rather than from judgment.*" (Italics added.) Given the difference in the instructions, it was not likely that the prosecutor's very brief argument here would have muddied the waters in the same way as the *Beltran* prosecutor's did. The prosecutor here expressly referenced CALCRIM No. 570 in conjunction with the challenged statements, directing the jury to the correct legal standard. The jury was also told that "[n]othing that the attorneys say is evidence"; that it must follow the law as explained by the court; and that if the attorneys' comments on the law conflicted with the court's instructions, it had to follow the instructions. (CALCRIM Nos. 222, 200.) "[W]e presume that the jury relied on the instructions, not the arguments, in convicting defendant." (*People v. Morales* (2001)

26

25 Cal.4th 34, 47; *People v. Boyette, supra,* 29 Cal.4th at p. 436; *People v. Najera, supra,* 138 Cal.App.4th at p. 224.) "Arguments by counsel 'generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law.' [Citations.]" (*People v. McDowell* (2012) 54 Cal.4th 395, 438.) Given the foregoing, it is not reasonably probable the jury disregarded the trial court's instructions. There is no probability the result would have been more favorable for Phillips had the jury been admonished not to consider the prosecutor's brief argument on this point, and he has failed to establish ineffective assistance. (See generally *People v. Brown, supra,* 59 Cal.4th at p. 109; *People v. Mai, supra,* 57 Cal.4th at p. 1009.)

3. *Sufficiency of the evidence*

Phillips contends the evidence was insufficient to support his convictions for the first degree murder of Taylor, the second degree murder of Johnson, and the attempted premeditated and deliberate murders of Raven and Sophia. We disagree.

a. *Applicable legal principles*

When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Houston* (2012) 54 Cal.4th 1186, 1215; *People v. Elliott* (2012) 53 Cal.4th 535, 585.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Brown, supra,* 59 Cal.4th at p. 106.)

27

Murder is an unlawful killing committed with malice aforethought.  (§ 187, subd. (a); *People v. Elmore* (2014) 59 Cal.4th 121, 132.)  Murder is of the first degree when it is committed in a willful, deliberate and premeditated fashion.  (§ 189; *Elmore*, at p. 133; *People v. Beltran, supra,* 56 Cal.4th at p. 942.)  Second degree murder is an unlawful killing with malice aforethought, but without the elements of willfulness, deliberation, and premeditation.  (§§ 187, subd. (a), 189; *Elmore*, at p. 133; *People v. Knoller* (2007) 41 Cal.4th 139, 151.)  Malice may be express or implied.  (§ 188; *Beltran*, at p. 941.)  A defendant acts with express malice if he or she intends to kill.  (§ 188; *Beltran*, at p. 941; *Elmore*, at p. 132; *People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1027.)  Malice is implied when a killing results from an intentional act, the natural and probable consequences of which are dangerous to human life, deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.  (*Elmore*, at p. 133; *People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the killing.  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1192; *People v. Ervine* (2009) 47 Cal.4th 745, 785.)

Premeditation and deliberation require more than a showing of intent to kill.  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; *People v. Concha* (2010) 182 Cal.App.4th 1072, 1083-1084.)  An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse.  (*People v. Burney* (2009) 47 Cal.4th 203, 235; *People v. Jurado* (2006) 38 Cal.4th 72, 118.)  "Premeditated" means considered beforehand; "deliberate" refers to careful weighing of considerations in forming a course of action.  (*Jurado*, at p. 118; *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  "The process of premeditation and deliberation does not require any extended period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]"  (*People v. Mayfield* (1997) 14 Cal.4th 668, 767; *People v. Solomon, supra,* 49 Cal.4th at p. 813.)

A reviewing court considers three types of evidence when determining whether a finding of premeditation and deliberation is adequately supported:  planning activity by the defendant; motive; and the manner of killing.  (*People v. Gonzalez, supra*, 54 Cal.4th at pp. 663-664; *People v. Burney*, *supra,* 47 Cal.4th at p. 235; *People v. Romero* (2008) 44 Cal.4th 386, 401; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  These so-called "*Anderson*" factors are not the exclusive means to establish premeditation, and need not be present in any particular combination, or at all, to establish the evidence was sufficient.  (*People v. Streeter* (2012) 54 Cal.4th 205, 242; *Gonzalez*, at p. 663; *Burney*, at p. 235.)  "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner."  (*Romero*, at p. 401.)

      b. *Application here*

There was ample evidence to prove Phillips committed the second degree murder of Johnson.  After arming himself and shooting into the ground, Phillips came through the sliding gate as the party guests scattered.  He then aimed and fired at Johnson as she attempted to run from him, hitting her in the head with a fatal shot.  This evidence established express malice, that is, Phillips's intent to kill Johnson.  (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1071 [a single shot to the head can support the inference of a deliberate intent to kill].)

Evidence of all three *Anderson* factors supported the jury's findings that Phillips committed the first degree murder of Taylor and the premeditated and deliberate attempted murders of Raven and Sophia.  First, there was evidence of planning.  Just after the argument, Phillips stated he was going to get his gun.  An empty cloth holster was found on the ground next to the van, and a gun case was found in the van.  From this evidence jurors could infer Phillips armed himself with a gun after the argument.  The Makarov was partially loaded when police found Phillips in the garage after the shooting, and an empty magazine was in Phillips's pocket.  As the criminalist explained, this evidence, coupled with the number of Makarov casings found at the scene, showed Phillips reloaded at some point during his rampage.  Phillips methodically pursued Taylor

and Raven through the house, demonstrating a calculated judgment to hunt and kill them. The foregoing evidence suggested the shootings were the product of preexisting thought and reflection, not an unconsidered impulse. (See *People v. Lee, supra,* 51 Cal.4th at p. 636 [facts that defendant brought a loaded gun and extra ammunition, and reloaded, indicated planning]; *People v. Koontz, supra,* 27 Cal.4th at p. 1082 [defendant's act of arming himself and following the victim was evidence of planning]; *People v. Wharton, supra,* 53 Cal.3d at pp. 547, 552 [defendant's retrieval of a hammer would constitute planning activity].)

Second, there was evidence of motive. Phillips had just argued with his stepdaughters. Taylor and Johnson had made disrespectful and antagonistic remarks to him. Phillips's statements to Sophia, that his stepdaughters were "bitches" and "whores" who did "this shit all the time" showed the animosity between him and his stepdaughters was of longstanding duration. From this, jurors could have concluded Phillips's actions were motivated by a desire for vengeance, and that he had made a calculated, considered decision to put an end to their conduct by killing them.

Third, the manner of killing and attempted killing showed premeditation and deliberation. Phillips shot Taylor twice in the thighs, incapacitating her, as she tried to run from him. He left her on the floor, calling for help, while he went to the bedroom and confronted the group hiding there. He then returned to finish her off with a shot to the heart. His methodical execution of her as she lay helpless on the ground evidenced a cold, calculated killing. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [even if the initial strangulation of the victim was spontaneous, the additional act of slashing her throat indicated a reasoned decision to kill]; *People v. Mendoza, supra,* 52 Cal.4th at p. 1071 [a close-range gunshot to the face is arguably sufficiently particular and exacting to permit an inference that the defendant was acting according to a preconceived design].) Phillips chased and fired directly at Raven, narrowly missing her head, as she fled from him. The fact he targeted the fleeing victims and delivered, or attempted to deliver, gunshots to vital organs suggested a preconceived design to kill. (See generally *People v. Prince* (2007) 40 Cal.4th 1179, 1253; *People v. Elliot* (2005) 37 Cal.4th 453, 471; *Lewis,*

at p. 1293.) Further, while in the house Phillips bypassed other guests and family members, demonstrating he was not shooting randomly but was specifically targeting his stepdaughters. From these facts, the jury could readily infer the killing and attempted killing were the result of preexisting thought and reflection.

The same is true in regard to the attempted murder of Sophia. Sophia had escorted Phillips out of the gate and had yelled at him, giving him a motive to attack her. After killing Taylor and targeting Raven in the house, Phillips returned to his van. Larry, Osborne, and James saw Phillips at the van after the murders, fumbling with something in his hands. From this evidence, the jury could have inferred Phillips was reloading the gun, in preparation for further killing. Upon seeing Sophia and the others, Phillips pursued them and fired shots at them as they fled. The extended nature of the shooting rampage, the fact Phillips reloaded the gun, and his act of shooting at Sophia while chasing her, all supported the jury's finding his attack on her was premeditated and deliberate.

Indeed, Phillips does not appear to dispute that the foregoing evidence was sufficient to demonstrate premeditation and deliberation. Instead, he argues that the evidence overwhelmingly supported convictions for heat-of-passion voluntary manslaughter and attempted voluntary manslaughter. He points out that Taylor and Johnson invited gang members to the party at his house, which upset him and would have upset a reasonable person; Taylor acted disrespectfully by countermanding his directive to the DJ not to play "gangster rap," and then dancing provocatively to a rap song; and his stepdaughters engaged in a heated argument with him, made disrespectful comments in front of numerous party guests, and ultimately had him thrown out of his own house by their gangster friends. This evidence, he urges, shows that he committed the shootings in the heat of passion, requiring verdicts of voluntary manslaughter and attempted voluntary manslaughter.

Phillips's argument essentially asks us reweigh the evidence and substitute our judgment for the jury's. This we cannot do. The fact the evidence might have been reconciled with a contrary finding does not warrant a reversal. (See, e.g., *People v.*

31

*Harris* (2013) 57 Cal.4th 804, 849-850; *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) We resolve neither credibility issues nor evidentiary conflicts. (*People v. Friend* (2009) 47 Cal.4th 1, 41; *People v. Tripp* (2007) 151 Cal.App.4th 951, 955; *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [where an appellant "merely reargues the evidence in a way more appropriate for trial than for appeal," we are bound by the trier of fact's determination].) Although it is the jury's duty to acquit if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Harris,* at pp. 849-850; *People v. Iboa* (2012) 207 Cal.App.4th 111, 117.) As we have discussed, the evidence supported the jury's verdicts, and there was no evidentiary deficit.

4. *Sentencing*

a. *Custody credits*

Phillips contends the trial court miscalculated his actual custody credits, and he is entitled to 2,559 days of actual custody credit, not the 2,557 days the trial court awarded. The People concede the point. We agree. Phillips was arrested on September 2, 2006. He was sentenced on September 4, 2013. Because 2008 and 2012 were leap years, he is entitled to two additional days of actual custody credit. The failure to properly calculate custody and conduct credit is a jurisdictional error that can be corrected at any time. (*People v. Chilelli* (2014) 225 Cal.App.4th 581, 591.) Accordingly, we order the judgment modified and the abstract of judgment corrected.

b. *Fines and fees*

The trial court imposed a court security fee in the amount of $120, and a criminal conviction assessment in the amount of $90. The People point out that, because Phillips was convicted of a total of six offenses, the court should have imposed six $40 assessments pursuant to section 1465.8 and six $30 assessments pursuant to Government Code section 70373. We agree. A court security fee (§ 1465.8, subd. (a)(1)) and a criminal conviction assessment (Gov. Code, § 70373) apply to each count of which a defendant is convicted. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483-484; *People*

*v. Schoeb* (2005) 132 Cal.App.4th 861, 865.) We order the judgment modified accordingly. (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157.)

DISPOSITION

The judgment is modified to reflect 2,559 days of actual custody credit, a $240 court security fee pursuant to section 1465.8, and a $180 criminal conviction assessment pursuant to Government Code section 70373. The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KITCHING, Acting P. J.

LAVIN, J.[*]

---

[*] Judge of the Superior Court of Los Angeles County assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.